Motion by plaintiff.

(Reap. Dec. 9311)

LURIA STEEL & TRADING CORP.
KURT ORBAN & CO. } *v.* UNITED STATES
F. J. CAZALAS ET AL.

Entry No. 686, etc.

(Decided February 13, 1959)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiffs.

*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster* and *William J. Vitale*, trial attorneys), for the defendant.

RAO, Judge: The merchandise covered by the above-enumerated appeals for reappraisement, which have been consolidated for purposes of trial, consists of prime hot rolled Thomas quality commercial

mild steel plates, in sizes 16 feet long by 6 feet wide, and $\frac{3}{16}$ to 1 inch in thickness, exported from Germany on June 21 and July 6, 1951. It was appraised on the basis of export value of similar merchandise at $170 per metric ton, less inland freight charges. Plaintiffs claim that the proper basis of value is the export value of such merchandise, as represented by the invoiced and entered values of $150 per metric ton, for thicknesses up to and including $\frac{7}{8}$ of an inch, and $151.10 for the 1-inch plates.

Export value is defined in section 402(d) of the Tariff Act of 1930 as follows:

The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

At the trial of this case, there was introduced into evidence, as plaintiff's exhibit 1, an affidavit of one Henry Bruning, procurist of Ferrostaal A.G., the shipper of the subject merchandise, by whom he had been employed for 7 years. In this affidavit, which is dated March 16, 1957, affiant stated that he was familiar with the prices at which steel plates were sold in Dusseldorf, Germany, the principal market, both for domestic consumption and for exportation to the United States, during the period covering the dates of exportation of the merchandise at bar; that, in the sizes imported, thicknesses ranging from $\frac{3}{16}$ to $\frac{7}{8}$ inch were sold and freely offered for sale to all purchasers for exportation to the United States at $150 per metric ton, f.o.b. Antwerp; that plates 1 inch in thickness were offered and sold at $151.10 per metric ton, f.o.b. Antwerp; that the cost of inland freight at the rate of $6 per metric ton was included in said f.o.b. prices; and that prices did not vary by reason of quantity purchased.

He further stated that his records of sales and offers for sale during the relevant period were no longer available, but that it was his "distinct recollection, and I am sure that it is correct" that such prices were in effect during that period.

As to domestic sales, affiant also stated that it was his distinct recollection that no offers of sale or sales were made in the ordinary course of trade at prices higher than those for exportation.

The only other evidence introduced on behalf of the plaintiffs were the invoices relating to the instant importations. These were received over objection of counsel for defendant, for whatever weight they may possess in accordance with the rules of evidence.

A consular report, dated December 8, 1952, was received in evidence as defendant's exhibit A. It reveals the result of an interview on November 10, 1952, between Vice Consul Howard Hill, and Messrs. Henry Bruening and Walther Schmitz, both stated to be officials with authority to act in behalf of Ferrostaal A.G., and Eduard Odendahl, chief clerk of the company's invoice department, with reference to consular invoices 3626, certified Bremen, Germany, September 30, 1950; 3340 certified Dusseldorf, Germany, June 25, 1951 (one of the invoices involved in the instant case), and others. It is therein stated that the three officials, upon being instructed to show clearly under column 11 of the consular invoice the freely offered price, either for home consumption or for export, suggested that "some confusion might have resulted from the coincidence that, in the invoices under reference that were certified in Duesseldorf, the export price had not changed during the interval between the acceptance of the order and the actual shipment."

In answer to a series of questions posed by the vice consul, the following information was elicited from the persons interviewed:

Ferrostaal is an agency, not a manufacturer, selling directly to purchasers. Sales for home consumption were subject to a system of allocations or quotas fixed by the Fach-Vereinigung Eisen und Stahlhandel (Association of Iron and Steel Dealers) based upon prior annual consumption of steel. There were no pricelists issued by the company. Basic prices were the same, regardless of quantities but discounts, determined by the amount of steel used by the consumer in the previous year, were granted. During the period of 1950 to July 24, 1951, the basic home consumption price for steel plate was DM 272.25 per metric ton. Sales were always made ex-factory, and there was no extra charge for packing. A tabulation of home consumption sales for the period under review would require the services of two employees for at least a month, as an estimated 5,000 to 6,000 orders involving 150,000 to 200,000 tons of such plates were involved.

Sales for exportation to the United States were made on an f.o.b. Bremen or Benelux port basis. They were not subject to any restrictions imposed by the seller, but an export license was necessary. Prices did not vary with the quantities purchased, and no discounts were allowed. It would require the full time of one employee for at least a week to compile a list of sales for exportation to the United States.

By virtue of a contract, effective as of January 1, 1952, for a period of 1 year, Ferrostaal Overseas Corp. of New York City became the United States agent for Ferrostaal A.G. No exclusive rights of sale were granted, and all orders were finally approved in the main office of Ferrostaal A.G. in Germany. A commission of 5 per centum was paid to the agent on every sale made in the United States.

A request from the appraiser of merchandise at the port of New Orleans to Ferrostaal Overseas Corp. for information concerning the home office's export prices, together with two letters in reply thereto, were received in evidence as defendant's collective exhibit B, over objection of counsel for plaintiffs. As it now plainly appears that Ferrostaal Overseas Corp. did not become the agent of the shipper until after the merchandise at bar was exported from Germany, and that the information supplied by the agent is necessarily hearsay, the court is not disposed to attach any weight to the contents of this collective exhibit.

Defendant's collective exhibit C is a report by American Vice Consul John C. Leary, dated November 9, 1953, concerning sales practices of Hoesch A.G. and Hoesch Export GmbH, both of Dortmund, Germany, and, respectively, manufacturer and shipper of steel plates. This exhibit was offered for the purpose of substantiating the values of similar merchandise adopted by the appraiser and shows for the period June 1951 to April 1952 an estimated basic export price of $170 to $180 per 1,000 kilos f.o.b. North Sea port for Thomas quality hot rolled heavy sheet. No information supplied in said exhibit purports to relate to the question of the similarity of the steel sheets therein described to the steel sheets which are the subject of this action. Moreover, inasmuch as the appraiser was not shown to have relied upon the Hoesch company's prices in his finding of value for the merchandise at bar, this exhibit has little, if any, evidentiary value.

Counsel for defendant also offered in evidence two office memoranda from P. J. Schug, director of the Customs Information Exchange at New York to the appraiser of merchandise at New Orleans, La. Ruling upon the admissibility of these memoranda was reserved, counsel for plaintiffs having objected thereto on the grounds that they are not the type of document referred to in section 501 of the Tariff Act of 1930 and, therefore, not within the exception to the hearsay rule; that they are unsworn; that they are not certified; that they are self-serving declarations; and that they are incompetent, irrelevant, and immaterial.

Said section 501, which is now 28 U.S.C., section 2633, provides in part as follows:

In finding the value of merchandise, in reappraisement proceedings before a single judge of the Customs Court, affidavits and depositions of persons whose attendance cannot reasonably be had, price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence.

The proffered documents are in the nature of "reports * * * of * * * other officers of the Government" within the contemplation of said section 2633, which contains no requirement for verification

or certification, or that such Government officials be available to testify. Accordingly, they are admitted into evidence as defendant's collective exhibit D. In substance, the two memoranda, dated August 26, 1953, and October 22, 1953, advise the appraiser at New Orleans that one Otto Wolf of Germany exported similar merchandise during the periods to be used as a basis of appraisement; that said Otto Wolf issued a pricelist; and that the prices mentioned therein are $170 per metric ton f.o.b. port of exportation for sizes ⅜'' and thicker and $171.05 for sizes 5/16'' to ⅜''.

Seemingly, the appraiser accepted the advice contained in plaintiffs' collective exhibit D and based his appraisement of the subject importations on the export value of similar merchandise as represented by said Otto Wolf's prevailing prices.

It may be affirmed as an elementary principle that the value of similar merchandise is irrelevant if such merchandise is freely offered for sale to all purchasers in the principal market of the country of exportation, in the usual wholesale quantity and in the ordinary course of trade. *United States* v. *J. J. Gavin & Co., Inc. (Soeldner-Heyman Co.)*, 24 Cust. Ct. 576, Reap. Dec. 7808; *United States* v. *Meadows Wye & Co., Inc.*, 15 Ct. Cust. Appls. 451, T.D. 42643. The question, therefore, arises whether plaintiffs have established a value for such merchandise within the statutory specifications therefor. It has been said (*Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495):

By statutory provision [1] Congress has directed that (1) the value found by the appraiser shall be presumed to be the value of the merchandise and (2) the burden shall rest upon the party who challenges its correctness to prove otherwise.

To sustain his burden of proof, and overcome this statutory presumption, it is incumbent upon appellant, the party challenging the value found by the appraiser in the first instance, to prove the action of the appraiser was erroneous and to establish some other dutiable value as the proper one. To do this, that party must meet every material issue involved in the case, and if he fails to do so the value fixed by the appraiser remains in full force and effect. *United States* v. *Gane and Ingram, Inc.*, 24 C.C.P.A. (Customs) 1, T.D. 48264, citing *United States* v. *T. D. Downing Co. (George H. Sweetnam, Inc.)*, 20 C.C.P.A. (Customs) 251, T.D. 46057. It is clear, from a reading of section 402 (c) and (d), *supra*, that in order to prove foreign value or export value as a basis for a valid reappraisement *the appellant must establish, inter alia, the usual wholesale quantities* in which such or similar merchandise involved was freely offered for sale to all purchasers in the principal markets of the country from which exported, etc. This court has so construed the statute in the case of *M. V. Jenkins et al.* v. *United States*, 34 C.C.P.A. (Customs) 33, C.A.D. 341, wherein we held that failure to satisfactorily establish the usual wholesale quantities constitutes a failure to establish one of the essential elements of a valid reappraisement. If appellant has failed to establish the usual wholesale quantities, then, in accordance with the foregoing, it seems clear that he has failed to meet his burden of proof, and the valuation set by the appraiser must stand. For reasons presently to appear, the

[1] This provision appeared in section 501 of the Tariff Act of 1930, 19 U.S.C. § 1501, until June 25, 1948 when it was removed from that section to section 2633, Title 28, U.S.C.

outcome of this case depends on whether appeallant [sic] has introduced substantial evidence to establish the usual wholesale quantities. [Italics quoted.]

In the *Brooks Paper Company* case, *supra*, the court held that a statement in an affidavit purporting to show the quantity of "the great majority of sales" was a conclusion of an ultimate fact, not an evidentiary fact, and, therefore, not evidence from which usual wholesale quantities are determinable.

Where, however, the price does not vary with the quantities sold, no question of usual wholesale quantities can arise. *Jenkins Brothers* v. *United States*, 25 C.C.P.A. (Customs) 90, T.D. 49093. And a statement by an affiant to that effect is one which, not being dependent upon interpretation of facts or evaluation of sales, is itself a fact, not a conclusion, to which a qualified witness is competent to attest, without the necessity of providing corroborative evidence. Similarly, it is competent for a witness to assert, as matter within his personal knowledge, that no restrictions accompanied his sales.

Although the latter statement is not included in plaintiffs' exhibit 1, it forms part of the information elicited from the affiant and others by the vice consul during the course of his investigation of the exporter of the instant merchandise. That report, which is in evidence in this case, is available to plaintiffs in establishing their *prima facie* case. *Wm. A. Foster & Co., Inc.* v. *United States*, 15 Cust. Ct. 459, Reap. Dec. 6233.

It is further established by defendant's exhibit A that sales of such merchandise for home consumption in Germany were subject to a quota system and were, therefore, not free offerings to all purchasers. The inference is also clear, in view of the fact that quotas were determined by the Association of Iron and Steel Dealers, that there was no foreign value for similar merchandise.

The statutory presumption of correctness of the appraiser's finding of value, upon which defendant was entitled to rely until a *prima facie* case was made out, has been overcome. Since the presumption is not evidence, and may not be weighed against the evidence produced at the trial, *Marshall Field & Co.* v. *United States*, 20 C.C.P.A. (Customs) 225, T.D. 46037; *Gallagher & Ascher, Inc.* v. *United States*, 67 Treas. Dec. 1365, Reap. Dec. 3536, the burden of going forward with proof shifted to the defendant. There is not a scintilla of evidence introduced by defendant which controverts plaintiffs' proof. Defendant's exhibit A is corroborative of plaintiffs' exhibit 1. The remainder of the documents submitted by the defendant relate to the value of similar merchandise, which, in view of their being a value for such merchandise, is irrelevant.

Accordingly, the court finds:

1. That the merchandise at bar consists of prime hot rolled Thomas quality commercial mild steel plates, 16 feet long by 6 feet wide,

ranging in thickness from $\frac{7}{16}$ inch up to and including 1 inch, exported from Germany on or about June 21, 1951, and July 6, 1951.

2. That said merchandise was appraised upon the basis of the export value of similar merchandise sold by one Otto Wolf, at $170 per metric ton, less inland freight charges.

3. That said merchandise was entered, as invoiced, upon the basis of the export value of such merchandise, at $150 per metric ton, for thicknesses up to and including $\frac{7}{8}$ of an inch, and at $151.10 per metric ton, for 1-inch plates.

4. That, at or about the dates of exportation herein, Ferrostaal A.G., the exporter of the instant merchandise, offered such merchandise for sale for exportation to the United States, freely and without any restrictions, in the ordinary course of trade, at prices which did not vary by reason of the quantity purchased and which were equivalent to the invoiced and entered values herein.

5. That such or similar merchandise was not freely offered for sale for home consumption in Germany, during the times herein pertinent.

6. That Dusseldorf, Germany, is the principal market of the country of exportation.

The court, therefore, concludes:

1. That, at or about the dates of exportation herein, steel plates such as those involved in this case were freely offered for sale and sold to all purchasers in the principal markets of the country of exportation, in the ordinary course of trade, for exportation to the United States, at the invoiced and entered prices, which did not vary by reason of the quantity sold.

2. That neither such nor similar merchandise was freely offered for sale in the principal markets of Germany for home consumption, and, therefore, there was no foreign value therefor.

3. That export value, as that value is defined in section 402(d) of the Tariff Act of 1930, is the proper basis of value of the merchandise at bar, and that such value is represented by the entered value.

Judgment will be entered accordingly.